**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2681-21

STATE OF NEW JERSEY,

      Plaintiff-Respondent/
      Cross-Appellant,

v.

JAMES OLBERT, a/k/a
JAMES C. OLBERT,

      Defendant-Appellant/
      Cross-Respondent.

_____

Argued October 15, 2024 – Decided November 22, 2024

Before Judges Sabatino, Gummer, and Jacobs.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 12-08-2165.

Alyssa A. Aiello argued the cause for appellant/cross-respondent (Jennifer Nicole Sellitti, Public Defender, attorney; Alyssa A. Aiello, Assistant Deputy Public Defender, of counsel and on the briefs).

Frank J. Ducoat argued the cause for respondent/cross-appellant (Theodore N. Stephens II, Essex County

Prosecutor, attorney; Frank J. Ducoat, Assistant
Prosecutor, of counsel and on the briefs).

PER CURIAM

Defendant James Olbert, who committed multiple murders and other serious offenses at the age of sixteen, appeals a 79-year revised prison sentence the trial court imposed on him following a remand by this court for resentencing. The State cross-appeals discrete aspects of that revised sentence.

For the reasons that follow, we vacate the trial court's decision because its innovative features are not authorized under current law. We therefore remand for a second resentencing.

I.

We incorporate by reference the background detailed in our previous opinion issued in 2018. State v. Olbert ("Olbert I"), No. A-496-15 (App. Div. Feb. 7, 2018). After being waived as a juvenile to adult court, defendant was found guilty by a jury of "numerous crimes, including the murder and robbery of a store owner, the robbery and felony murder of a pedestrian, the robberies of two other persons, a carjacking, the theft of another victim's credit and debit cards, weapons offenses, and other crimes." Id., slip op. at 2. The trial court initially imposed an aggregate 123-year sentence, with a period of 85% parole ineligibility pursuant to the No Early Release Act ("NERA"), N.J.S.A. 2C:43-

2

7.2. It is undisputed that original sentence was the functional equivalent of a sentence of life without parole ("LWOP").

On direct appeal, we affirmed defendant's convictions but remanded for resentencing in light of the precedential decisions in <u>Mongomery v. Louisiana</u>, 577 U.S. 190 (2016), as well as <u>State v. Zuber</u>, 227 N.J. 422 (2017), delineating certain constitutional restrictions on very lengthy sentences imposed on juvenile offenders. <u>Olbert I</u>, slip op. at 56.

At the resentencing hearing, the defense presented, without objection by the State, expert testimony by a clinical psychologist, Dr. Sean Hiscox, explaining why defendant as a sixteen-year-old minor was influenced by scientific factors to commit such serious crimes and why he might not be permanently incorrigible. As one facet of his report, discussed in limited depth in his testimony, Dr. Hiscox alluded to published studies showing why persons such as defendant who were exposed to lead as children can have brain damage that affects their behavior.

Under questioning by the trial court, Dr. Hiscox acknowledged that defendant falls within a class of offenders who may be deemed life-course persistent offenders ("LCPO"). That LCPO classification was a key part of the resentencing court's analysis.

3

As noted above, the court imposed on remand a 79-year term, with approximately 67 years of parole ineligibility. Additionally, in what the court conceived of as a permissible extension of our Supreme Court's reasoning in its second opinion in State v. Comer, 249 N.J. 359, 400–05 (2022) ("Comer II")—which authorized juvenile offenders convicted of adult crimes to petition for a "look-back" hearing to review a long prison sentence after serving 20 years—the trial court sua sponte provided defendant with two additional look-back opportunities at 40 and 60 years.

Also, as a component of that overall revised aggregate sentence, the court imposed a term of 27 years on one of the murder convictions, three years less than the 30-year mandatory minimum under N.J.S.A. 2C:11-3(b)(1).

Defendant appeals his revised sentence as another unconstitutional imposition of the functional equivalent of an LWOP. The State does not contest that the revised sentence is functionally an LWOP, but contends the sentence comports with constitutional limitations. The State cross-appeals the sentence insofar as it includes (1) a component term shorter than the applicable mandatory minimum term for murder, and (2) two additional look-back periods beyond the one 20-year period authorized by our Supreme Court.

More specifically, defendant presents the following arguments in his brief:

POINT I

THE DE FACTO LIFE-WITHOUT-PAROLE SENTENCE IMPOSED FOR CRIMES JAMES OLBERT COMMITTED WHEN HE WAS 16 YEARS OLD WAS UNCONSTITUTIONAL, BECAUSE IT WAS NOT BASED ON PROPER CONSIDERATION OF THE MILLER FACTORS AND DOES NOT ADEQUATELY REFLECT HIS MORAL CULPABILITY OR POTENTIAL FOR REFORM.

POINT II

THE MATTER MUST BE REMANDED TO A DIFFERENT JUDGE BECAUSE THE JUDGE BELOW HAS DEMONSTRATED THE INABILITY TO CONDUCT A PROPER MILLER ANALYSIS, AS HE IS CONSTITUTIONALLY REQUIRED TO DO.

Having considered these points, and the State's cross-appeal, we remand for a second resentencing. In doing so, we apply well-settled principles of appellate review of sentencing decisions.

Generally, and subject to the strictures of sentencing laws, "[a]n appellate court's review of a sentencing court's imposition of sentence is guided by an abuse of discretion standard." State v. Jones, 232 N.J. 308, 318 (2018). Within the scope of review, appellate courts may:

5

(a) review sentences to determine if the legislative policies, here the sentencing guidelines, were violated;

(b) review the aggravating and mitigating factors found below to determine whether those factors were based upon competent credible evidence in the record; and

(c) determine whether, even though the court sentenced in accordance with the guidelines, nevertheless the application of the guidelines to the facts of this case make the sentence clearly unreasonable so as to shock the judicial conscience.

[State v. Roth, 95 N.J. 334, 364–65 (1984).]

Notwithstanding that general deference to a sentencing court's zone of discretion, we review the legality of a sentence de novo, as a question of law. State v. Steingraber, 465 N.J. Super. 322, 327–28 (App. Div. 2020). "There are two categories of illegal sentences: those that exceed the penalties authorized for a particular offense, and those that are not authorized by law." State v. Hyland, 238 N.J. 135, 145 (2019). "Authorized by law," of course, excludes sentences that are unconstitutional. Zuber, 227 N.J. at 437.

## II.

We begin our discussion with an overview of the constitutional and statutory framework for imposing long prison sentences on juvenile offenders who have committed murder or other very serious crimes.

### A.

Graham v. Florida

In Graham v. Florida, 560 U.S. 48, 82 (2010), the United States Supreme Court held the Eighth Amendment of the United States Constitution prohibits the imposition of an LWOP sentence "on a juvenile offender who did not commit homicide." The Court observed that juveniles generally have reduced culpability and are "less deserving of the most severe punishments." Graham, 560 U.S. at 68.

Despite those generic observations about juveniles, the Court held in Graham that the State was not required to "guarantee eventual freedom" to a juvenile nonhomicide offender and need not "release that offender during his natural life." Id. at 75. Instead, the State must give defendants only "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." Ibid. The Court recognized that "[t]hose who commit truly horrifying crimes as juveniles may turn out to be irredeemable, and thus deserving of incarceration for the duration of their lives." Ibid.

The Miller Factors

Subsequently, in Miller v. Alabama, 567 U.S. 460, 465 (2012), the United States Supreme Court held the Constitution prohibits the imposition of statutory mandatory LWOP sentences upon minors, even in homicide cases. The Court

7

stated that the "mandatory penalty schemes" at issue, which required an LWOP sentence for anyone convicted of murder regardless of age, improperly prevented the sentencing court from taking account of the mitigating qualities of youth as required by Graham.  Miller, 567 U.S. at 473–77.

Specifically, the Court found in Miller:

> Mandatory life without parole precludes consideration of his chronological age and its hallmark features— among them, immaturity, impetuosity, and failure to appreciate risks and consequences.  It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional.  It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him.  Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for the incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys.
>
> [Id. at 477–78.]

Despite holding that mandatory LWOP statutes should not be applied to juveniles, the Supreme Court nevertheless made clear in Miller that it had not "foreclose[d] a sentencer's ability to make [the] judgment in homicide cases" on a case-by-case discretionary basis, that a juvenile offender's crime "'reflects

8

irreparable corruption'" warranting an LWOP sentence. Id. at 479–80 (quoting Roper v. Simmons, 543 U.S. 551, 573 (2005)). However, the Court declared that appropriate occasions for imposing this degree of penalty would be "uncommon." Id. at 479.

Thereafter, in Montgomery v. Louisiana, 577 U.S. 190, 212 (2016), the United States Supreme Court held the principles of Graham and Miller apply retroactively. The Court also reaffirmed the fair opportunity concept it had previously expressed in Miller: that juvenile defendants will be provided with an "opportunity for release" upon showing themselves to be capable of change. Id. at 212.

New Jersey Applications of These Principles in Zuber and Comer

The New Jersey Supreme Court addressed these juvenile offender sentencing concerns in State v. Zuber, 227 N.J. 422, 446–47 (2017), and a companion appeal in State v. Comer, ("Comer I") 227 N.J. 422, 433–34 (2017). The Court held in Zuber that "Miller's command that a sentencing judge 'take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison' . . . applies with equal strength to a sentence that is the practical equivalent of [an LWOP]." Zuber, 227 N.J. at 446–47 (quoting Miller, 567 U.S. at 480). The Court explained the

9

"proper focus" under the Eighth Amendment is "the amount of real time a juvenile will spend in jail and not the formal label attached to his sentence." Id. at 429.

Our Supreme Court held in Zuber that a sentencing judge must consider the Miller factors when sentencing a juvenile to a lengthy period of parole ineligibility. Id. at 447. It also held that a judge must consider the Miller factors, along with the state-law sentencing principles set forth in State v. Yarbough, 100 N.J. 627, 643–44 (1985), when imposing consecutive sentences upon juvenile offenders. Id. at 450. Notably for the present appeal, the Court also recognized that the aggregate impact of consecutively imposed sentences must be considered when sentencing judges apply the Miller factors. Id. at 447. A court must bear in mind a real-world practical expectation of when such an offender with consecutive aggregate sentences might be eligible for parole. Id. at 449–50.

The Court further held in Zuber that a judge must "do an individualized assessment of the juvenile about to be sentenced—with the principles of Graham and Miller in mind." Id. at 450. The Court distilled the "Miller factors" as encompassing (1) "[the] defendant's 'immaturity, impetuosity, and failure to appreciate risks and consequences'; (2) 'family and home environment'; (3)

family and peer pressures; (4) 'inability to deal with police officers or prosecutors' or his own attorney; and (5) 'the possibility of rehabilitation.'" Id. at 453 (quoting Miller, 567 U.S. at 478).

Consistent with Graham and Miller, our Supreme Court in Zuber did not categorically prohibit the imposition of functional LWOP sentences on juvenile offenders. Id. at 450–52. Instead, Zuber stated that "even when judges begin to use the Miller factors at sentencing," some juveniles may appropriately receive long sentences with substantial periods of parole ineligibility, "particularly in cases that involve multiple offenses on different occasions or multiple victims." Id. at 451.

"Look-Back" Hearings Adopted in Comer II

An important remedy adopted by our Supreme Court to assure compliance with these constitutional principles is what is known as a look-back period. Look-back periods refer to hearings authorized by the Court in Comer II, in which juvenile offenders convicted under N.J.S.A. 2C:11-3 of murder may petition the court to "reduce the original base sentence within the statutory range, and to reduce the parole bar to no less than 20 years." Comer II, 249 N.J. at 370. At such hearings, the presiding judge assesses the Miller factors "which are designed to consider the 'mitigating qualities of youth' . . . factors it could

not evaluate fully decades before—namely, whether the juvenile offender still fails to appreciate risks and consequences, and whether he has matured or been rehabilitated." Id. at 380–81.

Comer hearings were authorized by the Court in response to legislative inaction following Zuber, in which the Court had "ask[ed] the Legislature to consider enacting a scheme that provides for later review of juvenile sentences with lengthy periods of parole ineligibility." 227 N.J. at 453. Without such hearings, juveniles convicted as adults of murder under N.J.S.A. 2C:11-3 faced a mandatory minimum sentence of 30 years, a maximum sentence of LWOP, and 30 years of parole ineligibility. N.J.S.A. 2C:11-3(b)(1). Comer hearings accordingly address a "twofold" "constitutional concern":

> the court's lack of discretion to assess a juvenile's individual circumstances and the details of the offense before imposing a decades-long sentence with no possibility of parole; and the court's inability to review the original sentence later, when relevant information that could not be foreseen might be presented.
>
> [Comer II, 249 N.J. at 401.]

Responding to those constitutional concerns, the Court in Comer II fixed the look-back period at 20 years to align with the maximum sentence for a juvenile adjudicated of homicide under N.J.S.A. 2A:4A-44(d)(1)(a) and recommendations by the Criminal Sentencing and Disposition Commission,

which included representatives of the Governor, Legislature, Attorney General, Public Defender, and other stakeholders.[1]  Id. at 403–04.  At a look-back hearing, "the trial court would have the discretion to affirm or reduce a defendant's original base sentence within the statutory range, and to reduce the parole bar below the statutory limit to no less than 20 years."  Ibid.

B.

Turning to the present resentencing, we recognize the trial court endeavored with great effort to conduct an in-depth Miller analysis.  It allowed defendant to present substantial proofs of the Miller factors, particularly through the expert testimony of Dr. Hiscox, at a two-day evidentiary hearing.  At that hearing, the court asked numerous probing questions to clarify the expert's opinions and illuminate the issues.

After sifting carefully through the evidence, the trial court concluded in a 35-page written decision that, on balance, the Miller factors justified a lengthy aggregate sentence for defendant, but a substantial reduction of the original 123-

---

[1]  Comer II, 249 N.J. at 404, cited the 2019 Annual Report of the Criminal Sentencing & Disposition Commission, whose members unanimously recommended nine sentencing reforms, including an opportunity for "an offender sentenced as an adult for a crime committed as a juvenile to a term of 30 years or greater would be entitled to apply to the court for resentencing after serving 20 years."  N.J. Crim. Sent'g & Disposition Comm'n, Annual Report 29 (Nov. 2019).

year period. As we have already noted, the court reduced defendant's aggregate sentence to 79 years, with an 85% parole ineligibility, but subject to three (3) potential look-back hearings after serving 20, 40, and 60 years in prison. The 79-year period consists of a 52-year sentence for the murder of Miguel Torres, made consecutive to a 27-year sentence for the murder of Wilfredo Campos.

We begin our analysis of the resentence by addressing, in tandem, (1) defendant's arguments for leniency because of his exposure to lead paint as a child, and (2) the expert testimony and the court's analysis regarding whether defendant is a life-course persistent offender and the implications of that classification.

1.

Lead Paint Exposure

On appeal, defendant chiefly argues the resentencing court failed within its analysis of the Miller factors to afford sufficient consideration to his exposure to lead paint as a child. The pertinent, albeit limited, evidence on that subject was as follows.

Defendant's lead poisoning was first identified in September 1999, when he was four years old and was found to have what were described as "elevated"

lead levels.[2]  Defendant and all other New Jersey children had been tested for lead poisoning after the passage of N.J.S.A. 26:2-137.2 (effective March 6, 1996).  Retesting in November 2001 again found "elevated" levels of lead in defendant, specifically a Blood Lead Level ("BLL") of 14.[3]

Defendant cites a CDC chart of current retesting recommendations[4] (without supplying any authority for those recommendations' use in 1999), to argue the three-week retesting recommendation in 1999 implied that test had

---

[2]  A February 2, 2000 letter from the Newark Department of Health and Human Services identified the source of defendant's lead poisoning as his childhood apartment.

[3]  According to the U.S. Centers for Disease Control and Prevention ("CDC"), a BLL greater than 0 indicates the presence of lead in the blood, and "[e]ven low levels of lead in blood are associated with developmental delays, difficulty learning, and behavioral issues."  BLLs below 3.5 suggest the general absence of lead in a child's home.  For BLLs between 3.5 and 19, the CDC recommends "an environmental investigation of the home to identify potential sources of lead," reporting the BLL finding to "state or local health department[s,]" and additional medical diagnostic exams.  Ibid.  BLLs of 20 to 44 justify "an abdominal X-ray to check for lead-based paint chips" or inhaled lead dust and referral to poison control resources.  Patients with BLLs above 45 should be screened for admission to a hospital for rigorous decontamination.  Childhood Lead Poisoning Prevention, CDC (Apr. 17, 2024), https://www.cdc.gov/nceh/lead/overview.html.

[4] For initial BLL results of 20 to 44, the CDC recommends retesting within two weeks, whereas retesting within one month is recommended for BLLs of 10 to 19.  The three-week retesting period ordered by defendant's doctor in 1999 falls in between those two-week and one-month guidelines.  Ibid.

detected a BLL of 20 to 44. The trial court did not adopt such an inference in its brief discussion of defendant's lead exposure, and neither do we.

The 1999 documentation calling for defendant's retesting in three weeks does not state the recommendation was based on CDC's guidelines. A cautious, risk-averse physician might have chosen to confirm a child's suspected lead poisoning with more haste than the minimum period recommended by the CDC. Accordingly, the 1999 order for retesting of defendant's lead level in three weeks could be indicative of an initial BLL in the range of 10 to 19, and not necessarily support defendant's assertion that "the evidence suggests that it was above 20." In any event, these small differences in time frames relating to a retesting ordered by a doctor over twenty-five years ago has little probative value within the totality of circumstances that were explored in depth at defendant's resentencing.

Significantly, as of October 2004, when defendant was nine years old, his BLL had substantially declined to a level of 3, below the CDC's benchmark justifying more than the periodic retesting recommended for all children. This 2004 result is the latest BLL result in the record.

Defendant argues his childhood lead poisoning from at least ages four to nine likely caused him "irreversible learning disabilities as well as lowered

intelligence," "impulsivity and behavior problems," and "particularly attention-related behaviors." He contends such irrevocability of damage caused by lead poisoning is substantiated by our Legislature's codified finding that "even low levels of lead in the bloodstream have been shown to affect IQ, attention span, and academic achievement, in a manner that cannot be corrected." N.J.S.A. 26:2-137.2(d) (emphasis added).

Notably, Dr. Hiscox did not opine that the lead exposure was a predominant causal factor in producing defendant's criminal behavior, but simply identified it as part of the "constellation of factors." In addition to the lead exposure, Dr. Hiscox described this "constellation" as including the gang membership of defendant's father, the separation of defendant's parents at an early age, and violence defendant had observed in the community. Dr. Hiscox opined that these factors, in the aggregate, skewed defendant's aspirations towards illicit gang-oriented ends and increased his susceptibility to peer influence. At most, the expert described lead poisoning as "one contributing factor" that, combined with defendant's ADHD and conduct-disorder diagnoses, hindered his maturation.

Defendant has identified no published opinion from any jurisdiction in the United States that has treated lead poisoning as a mitigating factor in sentencing.

17

Although there is some academic research on the subject, our Supreme Court and Legislature have not adopted lead poisoning as such a mitigating factor.[5] Solely for purposes of our review of this case, we nonetheless shall assume, but without deciding, that lead exposure can be an appropriate mitigating consideration in sentencing an offender.

2.

---

[5] Without resolving the academic debate here, the scholarship addressing whether and how lead-poisoning impacts should be considered within the arena of criminal justice appears to be divided. In Considering Lead Poisoning as a Criminal Defense, 20 FORDHAM URB. L. J. 377 (1993), Professor Deborah W. Denno analyzed data from the Biosocial Study, a longitudinal study that tracked nearly one thousand people from their births in Philadelphia until their twenty-fourth birthdays. Examining the common causes and effects of childhood lead poisoning, Professor Denno concluded its limited ability to explain future criminal activity cautions against embracing lead poisoning as a criminal defense. Id. at 396. By contrast, more recently in Reduced Culpability Without Reduced Punishment: A Case for Why Lead Poisoning Should Be Considered a Mitigating Factor in Criminal Sentencing, 108 J. CRIM. L. & CRIMINOLOGY 569 (2018), Eleanor Kittilstad examined medical and environmental studies that tie lead poisoning to adverse behavioral and intellectual consequences. She advocated sentencing reform to consider evidence of neurological damage caused by lead exposure. Id. at 571. We note that no authors of such studies were called as experts in the two-day resentencing hearing in this case, and that the soundness of the scientific methodologies involved was not evaluated under the pertinent "Daubert" factors of reliability. State v. Olenowski, 255 N.J. 529 (2023) (applying the Daubert factors to an expert methodology); State v. Olenowski, 253 N.J. 133 (2023) (prescribing the use of Daubert factors in New Jersey criminal cases); Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993).

LCPO Status

Defendant asserts the trial court erred by imposing the functional equivalent of an LWOP sentence, despite the science concerning lead exposure. He contends the court went astray in focusing instead on defendant's classification as an LCPO and thereby finding that he "is not a youthful offender whose antisocial behavior will decrease with his advancing chronological age."

LCPO classification derives from scholarship in the 1990s by Terrie Moffitt, Ph.D., whose theory of developmental taxonomy was summarized by later research:

> Adolescent offenders fall into one of two broad categories: adolescence-limited offenders, whose antisocial behavior begins and ends during adolescence, and a much smaller group of life-course-persistent offenders, whose antisocial behavior begins in childhood and continues through adolescence and into adulthood. According to Moffitt, the criminal activity of both groups during adolescence is similar, but the underlying causes of their behavior are very different. [LCPOs] show longstanding patterns of antisocial behavior that appear to be rooted, at least in part, in relatively stable psychological attributes that are present early in development and that are attributable to deficient socialization or neurobiological anomalies. Adolescence-limited offending, in contrast, is the product of forces that are inherent features of adolescence as a developmental period, including peer pressure, experimentation with risk, and demonstrations of bravado aimed at enhancing one's status in the social hierarchy of the peer group.

By definition, <u>the causes of adolescence-limited offending weaken as individuals mature into adulthood</u>.

[Laurence Steinberg & Elizabeth S. Scott, <u>Less Guilty by Reason of Adolescence</u>, 58 Am. Psych. 1009, 1015 (2003) (emphasis added), referencing Terrie E. Moffitt, <u>Adolescence-Limited and Life-Course-Persistent Antisocial Behavior: A Developmental Taxonomy</u>, 100 Psych. Rev. 674 (1993).]

Significantly, defendant's own expert, Dr. Hiscox, classified defendant as an LCPO. The State cross-examined Dr. Hiscox on this Steinberg and Scott scholarship, based on Dr. Hiscox's citation to them in his expert report. In that cross-examination, Dr. Hiscox acknowledged that if defendant were an "adolescence-limited offender" rather than an LCPO, he "would have noted that . . . as a . . . potential mitigating factor" in his report, and he had not.

Dr. Hiscox acknowledged the data cited by Steinberg and Scott strongly supported the classification of juvenile offenders as either LCPOs or adolescence-limited offenders, thereby predicting generally whether such offenders could mature. Even so, he opined that research provided little assistance in forecasting when such maturation might occur.

Defendant argues Dr. Hiscox's testimony supplied unrebutted evidence that even LCPOs may desist from crime over time as they age, because, as he

stated, "age is a powerful moderator . . . in terms of criminal behavior and recidivism."

3.

With this background in mind, we proceed to evaluate the combined import of the lead exposure and the LCPO evidence presented at the hearing.

The trial court considered and addressed at length the opinions of defendant's expert Dr. Hiscox. To be sure, the court said little in its written decision about defendant's lead paint exposure. But Dr. Hiscox himself made only abbreviated reference to the subject, deeming it, as we noted above, simply "one contributing factor" that is part of the overall "constellation of factors."

In the absence here of (1) expert opinion that plainly and directly attributed this defendant's criminal behavior to lead exposure as a pivotal causal factor and (2) legal authority in this State declaring lead exposure as a cognizable mitigating factor at sentencing, we do not fault the trial court for not saying more about that exposure within its analysis.

Nor do we fault the trial court for focusing its attention more on defendant's classification as an LCPO. The court observed in its decision that LCPO classification can be caused by "deficient socialization or neurobiological

21

anomalies." The court found Dr. Hiscox's LCPO classification of defendant supported by both potential causes here based on evidence in the record.

The court duly considered the neurobiological anomalies discussed by Dr. Hiscox with reference to defendant's medical and school records, which reflected medical diagnoses and observations by defendant's mother and teachers evidencing mental health issues since early childhood. The court also found defendant's father's gang affiliation provided a "criminogenic environment" of the type highlighted by Moffitt as evidence of deficient socialization. The judge further noted that defendant's behavior aligned with scholarship analyzing the effect of gang involvement on child maturation, and that defendant's conduct reflected the illicit methods and aspirations associated with gang culture.

The trial court reasonably found defendant's LCPO classification was evidenced by both deficient socialization and neurobiological anomalies. The court particularly considered Dr. Hiscox's expert testimony and defendant's LCPO classification with respect to the fifth Miller factor, i.e., the possibility of rehabilitation. On this subject, Dr. Hiscox observed that a subset of LCPOs defy their classification and halt criminal activity as they mature. He opined that defendant could fit into this subset based on his "positive progress" from 2016,

the date of his last disciplinary incident while incarcerated, to the 2021 resentencing. Dr. Hiscox conceded he would "[n]o doubt" be in a better position in 20 years to opine whether defendant was an LCPO capable of rehabilitation and would not make such a determination this early in defendant's life.

The trial court reasonably rejected Dr. Hiscox's characterization of defendant's recent past as a "positive trajectory," finding to the contrary in its decision:

> [Defendant] has engaged in antisocial conduct in each social setting he encountered throughout his lifetime. In the streets, he engaged in countless fights, used (and sold) drugs, and committed thefts. At school, he was repeatedly suspended and expelled for truancy and disruptive behavior, including fighting with other students and threatening to kill a teacher. Although he had a loving relationship with his mother, he repeatedly refused to comply with her requests to attend school, to take his medication, and to participate in counseling. When his brother supported his mother's demand that he stop[] smoking marijuana in their home, defendant summoned a fellow gang member to shoot his sibling. While in the youth house, defendant was adjudicated a delinquent for physically threatening another juvenile to join his gang. That incident resulted in defendant's pretrial custody transfer to the adult Essex County Correctional Facility. Once in that adult detention facility, defendant reports that he was assaulted by a rival gang member. While in state prison, he lost recreational privileges for ninety (90) days in 2016 for not accepting a work assignment. Later that year, he was placed in administrative segregation for seven (7)

23

months for threatening another prisoner. Since that time, he has not been administratively disciplined.

In addition, the court noted "[t]he emerging, yet equivocal, present status of defendant's rehabilitation efforts illustrates the sagacity of the 20 year 'look back' provisions." On a positive front, Dr. Hiscox noted that defendant, while in prison, had achieved his GED, converted to Islam, worked as a janitor, and completed psychoeducational programming. Defense counsel asserted that defendant had disassociated from his gang.

On the other hand, the State criticized "defendant's recent statements as self-serving attempts to evade punishment" generated only after defendant's conviction had been affirmed by this court in 2016. The State argued that defendant's incident-free five years in the general prison population merely reflected his relative junior status in the adult prison, in contrast to his previous attacks as a senior gang member in youth facilities, where he often was drawn into violent confrontations with fellow residents. Weighing these competing points, the court reasonably found "[a]t best, this disassociation evidence is equivocal."

Overall, the trial court gave due regard to the expert and factual evidence in its assessment of the Miller factors. The assessment was not arbitrary or capricious. The court did not ignore defendant's lead-exposure argument,

24

regardless of whether it is an argument tenable under the law and obligatory for sentencing courts to consider.

Furthermore, although we do not categorically endorse or reject here judicial reliance on LCPO concepts and expert opinions on that subject, defendant has not demonstrated that the court's LCPO discussion here was arbitrary, unreasonable, or contrary to law.

In sum, the trial court conscientiously weighed the evidence and arguments before it and thoughtfully addressed each of the Miller factors in detail in its extensive decision.

4.

That said, we have concerns that the trial court's calibration of a 79-year NERA sentence was based in significant part on its inclusion, sua sponte, of two additional potential look-back hearings at 40 and 60 years, if defendant is not released sooner at the 20-year interval prescribed by the Supreme Court in Comer II. The court appears to have inserted those added look-backs as measures designed to ameliorate the overall severity of the aggregate sentence.

Although we appreciate the court's thoughtful effort to be innovative, our present sentencing laws and Supreme Court precedents do not authorize such additional look-back proceedings beyond the initial 20-year interval. We

understand the defense does not wish to look a proverbial gift horse in the mouth, but also appreciate the defense's position that heretofore legally unauthorized extra look-backs cannot be tacked on to justify what the defense contends is an excessively long and unconstitutional prison term.

Consequently, the court erred in including two extra look-backs, and they must be excised. But doing that could undermine the logic and equitable balancing of the court's reasoning and its sense of the overall fairness of meting out a 79-year NERA term.

This interdependency problem is compounded by what the State and defense counsel agree was the court's improvident imposition of a 27-year term on the murder conviction relating to one of the victims, Campos. As we have noted, that term is three years below the 30-year statutory mandatory minimum sentence for murder. See N.J.S.A. 2C:11-3(b)(1). Consequently, the State's unopposed cross-appeal on this facet of the sentence is meritorious.

However, we respectfully decline the State's suggestion that we exercise original jurisdiction and recalibrate the sentence ourselves by raising the 27-year term to 30 years and offsetting that with reductions of other portions of the sentence. The sentencing terms are too interdependent to be reconfigured in such a manner on appeal, and it is unfair to defendant to do so without a hearing.

26

Given the circumstances, we are constrained to remand this matter, once again, for another resentencing hearing.  At such a hearing, defendant is entitled to present updated evidence of his present status and possible rehabilitative progress.  State v. Randolph, 210 N.J. 330, 354 (2012).  Because the judge who presided over the last resentencing has since retired, the hearing will be conducted by a different judge.  The court and counsel shall convene a case management conference within forty-five days to plan the resentencing and discuss the exchange of updated reports and information and take whatever other action necessary in preparation for the resentencing.

Reversed in part and remanded for resentencing.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION